# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-2329/2355/2357/2390/2392/2393

_____

| | | |
|---|---|---|
| In re: Sac & Fox Tribe of the | * | Appeals from the United States |
| Mississippi in Iowa / | * | District Court for the |
| Meskwaki Casino Litigation | * | Northern District of Iowa. |

_____

Submitted: July 24, 2003
Filed: August 27, 2003
_____

Before WOLLMAN, MURPHY, and MELLOY, Circuit Judges.
_____

MELLOY, Circuit Judge.

These consolidated appeals involve the intersection of an issue that is subject to federal regulation, namely, the operation of Class III gaming on Indian lands, with an issue that is subject to tribal control, namely, the right of a limited sovereign to interpret its own constitution and select its own leaders. As to the gaming issue, we affirm the district court's grant of a preliminary injunction enforcing a temporary closure order from the Chairman of the National Indian Gaming Commission (the "NIGC") and the district court's dismissal of a premature challenge to the temporary closure order. We reverse, however, the district court's dismissal of a claim by the federally recognized tribal council to enjoin illegal gaming under 25 U.S.C. § 2710(d)(7)(A)(ii). As to the issue of tribal leadership, we affirm the district court's dismissal of the federally recognized tribal council's action for broader injunctive and declaratory relief.

# I. Background

The Sac & Fox Tribe of the Mississippi in Iowa (the "Tribe"), a federally recognized Indian tribe, operates the Meskwaki Casino•Bingo•Hotel under a state-tribal compact with the State of Iowa as authorized by the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C. § 2710(d)(1). A Tribal Constitution approved by the Secretary of the Interior in 1937 provides that the Tribe is to be governed by an elected Tribal Council. Alex Walker, Jr., leads the current, elected Tribal Council (the "Elected Council"). The Elected Council refers to itself throughout these proceedings as the federally recognized Tribal Council. The Tribal Constitution vests broad power in the Tribal Council, including dispute resolution powers, and does not establish an independent Tribal Court.

In the fall of 2002, members of the Tribe who were dissatisfied with the conduct of the Elected Council alleged illegal conduct by the Elected Council and circulated petitions to seek a special election to recall the entire council. Article XII of the Tribal Constitution expressly provides for such a recall procedure:

> Upon a petition signed by not less than thirty percent of the eligible voters of the Tribe, enumerated at the last general election, the Tribal Council shall call a special election to ratify or reject any action by the Tribal Council or to recall any member of the Tribal Council.

The petitioners needed 243 signatures and collected 283. The Elected Council, however, rejected the petition as invalid due to alleged irregularities and refused to call a special election. The Elected Council claims that some of the signatures were forged. The Elected Council does not claim to have conducted an investigation to determine if there were 243 valid signatures, nor does the Elected Council provide any further explanation of the alleged irregularities. Rather, the Elected Council states only that it was satisfied that the irregularities were sufficient not to warrant a recall election.

Because the Tribal Constitution grants to the Tribal Council dispute resolution powers and the duty to call a special election, there is no separate Tribal body to which the petitioners may appeal the Elected Council's action other than the Elected Council itself. On March 3, 2003, faced with the Elected Council's ongoing refusal to call a special election, members of the Tribe chose to pursue a self-help remedy not provided under the Tribal Constitution. Charlie Old Bear, the hereditary Chief of the Tribe, appointed a group led by Homer Bear, Jr., as an interim council (the "Appointed Council"). The Appointed Council claimed authority to govern the Tribe alleging a traditional form of Tribal government that predated the 1937 Tribal Constitution.

The members of the Appointed Council – who previously led the recall petition effort – did not seek BIA assistance in securing a recall election before pursuing their self-help remedy. In a letter dated March 13, however, they did seek BIA recognition as the new government of the Tribe. The BIA's Regional Director replied, stating, "[t]here are no provisions in [Tribal Constitution Articles X and XII] for the BIA to intervene in those tribal process[es] nor is there an appeal to the BIA." Quoting a 1996 BIA ruling, Wadena, et al. v. Acting Minneapolis Area Director, IBIA 96-99-A, the Regional Director stated, "the Band, as a sovereign nation, has not only the right, but also the responsibility, to resolve this dispute for itself, without further interference from [the] BIA. As long as the Band's final resolution does not conflict with its governing documents or the Indian Civil Rights Act, 25 U.S.C. § 1302, [the] BIA must defer to the Band's resolution of this intra-tribal dispute."

The Appointed Council subsequently built support among members of the Tribe, and, on March 26, took control of the casino, other Tribal facilities, and some of the Tribe's finances. The Elected Council alleges that the Appointed Council seized the casino by force and placed armed guards in various Tribal buildings. During this time, the casino remained open and continued to operate under the control

of the Appointed Council. The Elected Council alleges that the Appointed Council excluded members of the Elected Council from the casino and other Tribal facilities, but permitted members of the Elected Council, like all members of the Tribe, to receive their monthly dividend check. The Appointed Council notified two banks that held gaming proceeds, Wells Fargo Bank Iowa, N.A., and the State Bank of Toledo, that only the Appointed Council possessed authority to act on behalf of the Tribe. Faced with uncertainty over which council possessed authority to act on behalf of the Tribe, the banks froze Tribal accounts.

Facing the Appointed Council's appropriation of power, the Elected Council sought BIA confirmation of continued recognition. In response to a March 27 request from the Elected Council, the Regional Director of the BIA declined to confirm that the Elected Council was the federally recognized governing body for the Tribe and, again, refused to "intervene in this internal matter at this time." In an April 1 letter to Congressman Leonard Boswell, however, the Acting Assistant Secretary of the Interior for Indian Affairs stated that the Department the Interior "continue[d] to recognize the elected Tribal Council . . . as the leadership of the Tribe." Since April 1, the BIA has consistently recognized the Elected Council as the leadership of the Tribe.

On April 8, the Elected Council filed suit in the United States District Court for the Northern District of Iowa against the members of the Appointed Council and against the banks that froze Tribal accounts or held deposits made by the Appointed Council. The Elected Council's complaint contained claims for declaratory and injunctive relief. In the claim for declaratory relief, the Elected Council sought a judgment declaring that the Elected Council "has the exclusive right to control the financial assets of the Tribe, with the power to collect, deposit, and disburse those assets and funds for the benefit of the Tribe" and that the members of the Appointed Council have "no legal authority to act on behalf of or bind the Tribe with respect to the gaming revenues described above." In claims for injunctive relief, one of which

-4-

the Elected Council captioned as a claim under the Racketeering Influenced and Corrupt Organization Act ("RICO"), the Elected Council sought an order (1) requiring the Appointed Council to account for and return all Tribal money and property, (2) prohibiting the Appointed Council from representing themselves as authorized representatives of the Tribe or enforcing any personnel actions against the employees of any Tribal operations, and (3) requiring the defendant banks to honor the Elected Council's instructions regarding Tribal funds.

The district court held a hearing on April 10, and, on April 15, dismissed the Elected Council's action in its entirety for lack of subject matter jurisdiction. The district court characterized the relief sought by the Elected Council as judicial intervention in a non-justiciable, intra-tribal dispute. In reaching this conclusion, the district court examined and rejected three specific bases for federal question jurisdiction. First, the district court found no basis for jurisdiction under the United States' general trust responsibilities because "[c]asino revenues do not constitute property held in trust by the federal government, but are instead tribal property." District Court Order at 5 (citing Smith v. Babbitt, 875 F. Supp. 1353, 1369 (D. Minn. 1996)). The district court next determined that the "IGRA does not provide a general private right of action" and the "relief requested here is not to enforce or to determine compliance with the IGRA, but rather to decide which Tribal Council is properly in place under the Tribe's Constitution." District Court Order at 7-8. Finally, the district court dismissed the Elected Council's RICO action because the underlying acts of the Appointed Counsel, as alleged by the Elected Council, could only qualify as predicate offenses if the court first concluded that the Appointed Council lacked authority under Tribal law to govern the Tribe.

Continuing in their efforts to gain legitimacy, the Appointed Council held a meeting on April 14. The Appointed Council asked Tribal members to determine whether members of the Elected Council were "deemed persons of honor, law abiding, and of good character." Elected Council supporters boycotted the meeting.

The 242 voters who participated overwhelming voted that the seven Elected Council members were unfit to govern. In response to April 3 and April 18 letters from the Appointed Council, the Deputy Commissioner of Indian Affairs stated, "[t]he Bureau of Indian Affairs continues to recognize Mr. Alex Walker, Jr., as the elected Chief of the Council, and the other elected representatives to the Council as well." Accordingly, although the BIA initially refused to recognize either council, it was clear in April that the BIA and the Secretary of the Interior had extended, at a minimum, interim recognition to the Elected Council.

On April 30, the Chairman of the NIGC issued a Notice of Violation ("NOV") addressed to both councils. The NOV outlined violations of the IGRA and the Tribal-State compact. The violations all stemmed from the fact that gaming at the casino was "not being conducted by . . . the governmental authority recognized by the Secretary of the Interior." The NOV required the Elected Council, recognized by the Secretary of the Interior, to reassume control of the casino by May 2, 2003. The NOV described procedures for administrative appeal.

The May 2 deadline passed with the Appointed Council still in control of the casino. On May 12, the Chairman of the NIGC issued a temporary closure order. The order, by its terms, was effective immediately and explained the procedures available for expedited review by the Chairman and administrative appeal to the full NIGC.

The Appointed Council sought neither expedited review before the Chairman nor administrative review before the entire NIGC; rather, the Appointed Council continued to operate the casino. On May 14, the Appointed Council (nominally on behalf of the Tribe) filed suit in the United States District Court for the Northern District of Iowa against the United States and against the Chairman of the NIGC. The Appointed Council characterized its action as a Petition for Review of Agency Action and a Motion for Temporary Restraining Order. The Appointed Council specifically

requested a court order setting aside the NOV and temporary closure order, or, in the alternative, suspension of enforcement of the temporary closure order pending administrative review by the NIGC. In addition, the Appointed Council raised a claim under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against the Chairman alleging that the Chairman's action in issuing the temporary closure order constituted a violation of the Tribe's rights under the Constitution of the United States. The United States moved to dismiss the action alleging a lack of subject matter jurisdiction based on the Appointed Council's failure to exhaust administrative remedies. The district court scheduled arguments on the Appointed Counsel's action for Monday, May 19.

On Friday, May 16, the United States, on behalf of the NIGC, instituted a separate action against the leaders of the Appointed and Elected Councils. The United States' action was captioned as a Complaint for Injunctive Relief and a Motion for Temporary Restraining Order. The United States sought enforcement of the closure order through a court order to prohibit the Appointed and Elected Councils from conducting gaming activities on Tribal Land "pending administrative action by the NIGC on whether the Temporary Closure Order should be made permanent."

On May 19, the day of the hearing, the Elected Council moved to intervene in the Appointed Council's suit against the NIGC. The Elected Council, as intervenor, asserted claims against the Appointed Council under 25 U.S.C. § 2710(d)(7)(A)(ii) seeking an order to enjoin the Appointed Council from conducting gaming at the casino and to require the Appointed Council to "surrender physical control of the Casino, its revenues, the tribal government buildings, and all bank accounts containing Tribal monies." The Elected Council also asserted claims against the Chairman of the NIGC, seeking an order to enjoin the Chairman's enforcement of the closure order, to instruct the Chairman to remove the Appointed Council, and to order the Chairman to "limit the scope of punitive enforcement action to the illegal conduct

-7-

of those individuals who are preventing the federally recognized Tribal government from operating the Tribe's Casino." In addition, the Elected Council asserted trespass claims under state law against both the Appointed Council and the Chairman.

The Appointed Council claims that it did not receive the United States' complaint and motion of May 16 prior to the morning of arguments on its own motion for injunctive relief. On that day, Monday May 19, the district court consolidated the cases and heard arguments on both cases, including the intervenor's motion. After the hearing, the district court granted the parties one day to file post-hearing briefs.

On May 22, the district court dismissed the Appointed Council's claims for lack of subject matter jurisdiction and found that the IGRA required administrative appeal of the Chairman's temporary closure order prior to judicial review. The district court dismissed the Appointed Council's <u>Bivens</u> claim sub silentio. In addition, the district court granted the United States' motion for injunctive relief in the form of an order to enforce the Chairman's temporary closure order. The district court characterized its order as a preliminary injunction rather than a temporary restraining order. The district court denied all other motions (including the Elected Council's claims as intervenor) as moot.

The following day, May 23, U.S. Marshals closed the casino. The Elected and Appointed Councils appealed, and we consolidated the appeals from the district court's April 15 and May 22 orders. On June 12, the Elected Council appealed to the NIGC for administrative review of the Chairman's NOV and closure order, but did not ask for a hearing. The Appointed Council did not file an appeal to the NIGC within the 30 day window provided under 25 U.S.C. § 2713(b)(2). On July 10, the Elected Council completed briefing on its administrative appeal. Under 25 U.S.C. 2713(b), the NIGC is required to rule on the administrative appeal withing 60 days of a hearing. Because no hearing was granted, the NIGC considers the 60 day

deadline to run from the date on which the administrative appellant, the Elected Council, submitted its brief. The NIGC has not yet issued its ruling.

## II. Motion to Dismiss the Appointed Council's Claims

We first address the district court's May 22 dismissal of the Appointed Council's claims to enjoin enforcement of the Chairman's temporary closure order. To bring a claim against an agency of the Federal government, as the Appointed Council does here, there must be a waiver of sovereign immunity. The Administrative Procedures Act ("APA") can provide the necessary waiver but only where a statute does not preclude judicial review. 5 U.S.C. § 702 (providing a right of review); 5 U.S.C. § 701(a)(1) (stating that the APA does not apply where statutes otherwise preclude judicial review). The district court found that the IGRA precluded judicial review of the Chairman's temporary closure order and dismissed the Appointed Council's claims for failure to exhaust administrative remedies. We review de novo a dismissal for lack of subject matter jurisdiction. Great Plains Coop v. Commodity Futures Trading Comm'n, 205 F.3d 353, 354 (8th Cir. 2000).

The Appointed Council argues that because the IGRA does not contain language that expressly precludes APA review of the Chairman's temporary closure order, such review must be permitted. We disagree. In Block v. Community Nutrition Institute, 467 U.S. 340, 345 (1984), the Supreme Court held that the availability of APA review is not based solely on the express language of the statute. Rather:

> The APA confers a general cause of action upon persons adversely affected or aggrieved by agency action within the meaning of a relevant statute, but withdraws that cause of action to the extent the relevant statute precludes judicial review. *Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme,*

*its objectives, its legislative history, and the nature of the administrative action involved.*

Id. (internal quotations and citations omitted) (emphasis added). In United States v. Fausto, 484 U.S. 439 (1988), the Court held: "As we have made clear elsewhere, the presumption favoring judicial review is not to be applied in the 'strict evidentiary sense,' but may be 'overcom[e] whenever the congressional intent to preclude review is fairly discernible in the statutory scheme.'" Id. at 452 (citing Block, 467 U.S. at 351). Both Fausto and Block found congressional intent to preclude review based not on explicit language (as the Appointed Council argues we must), but based on "inferences of intent" drawn from the respective, relevant statutory schemes as a whole. Fausto, 484 U.S. at 452; Block, 467 U.S. at 349.

Congressional intent to preclude APA review of the Chairman's temporary closure order and to permit APA review of the NIGC's subsequent final action is more than fairly discernible in the IGRA's statutory scheme. The IGRA contains a detailed enforcement and administrative review system. It allows the NIGC Chairman to order temporary closure of an IGRA-regulated game for substantial violation of the IGRA, the NIGC's regulations, or Tribal regulations, ordinances, and resolutions. 25 U.S.C. § 2713(b)(1). The Chairman's order is then subject to administrative review:

> Not later than thirty days after the issuance by the Chairman of an order of temporary closure, the Indian tribe or management contractor involved shall have a right to a hearing before the Commission to determine whether such order should be made permanent or dissolved. Not later than sixty days following such hearing, the Commission shall, by a vote of not less than two of its members, decide whether to order a permanent closure of the gaming operation.

25 U.S.C. § 2713(b)(2). Following this administrative review process, the IGRA expressly provides for judicial review of the NIGC's final decision under the APA:

-10-

> A decision of the Commission to give final approval of a fine levied by the Chairman or to order a permanent closure pursuant to this section shall be appealable to the appropriate Federal district court pursuant to chapter 7 of Title 5.

25 U.S.C. § 2713(c).  Later, the IGRA reiterates its explicit support for APA review of final decisions from the full NIGC:

> Decisions made by the *Commission* pursuant to sections 2710, 2711, 2712, and 2713 of this title shall be final agency decisions for purposes of appeal to the appropriate Federal district court pursuant to chapter 7 of Title 5.

25 U.S.C. § 2714 (emphasis added).

> The APA itself precludes review of preliminary or intermediate agency action:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  *A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.*

5 U.S.C. § 704.  The Appointed Council argues that the temporary closure order is a "final agency action" subject to judicial review.  We disagree.  The Supreme Court utilizes a two part test to determine whether an agency action is final for purposes of the APA: "First, the action must mark the consummation of the agency's decisionmaking process--it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotations and citations omitted).

Although the Chairman's closure order is effective immediately and impacts the parties, it does so only on a temporary basis. A temporary closure order inherently is not "the consummation of the agency's decisionmaking process," even though it may have an immediate effect on the Tribe's finances in the near term. The IGRA by its express terms makes the actions of the Chairman in issuing an NOV or temporary closure order preliminary and intermediate. The IGRA contains no language making a temporary closure order by the Chairman judicially reviewable. As already discussed, the detailed appeal process to the NIGC as a whole is another "adequate remedy." Accordingly, the Chairman's action is not a final agency action under Bennett.

We previously addressed a temporary closure order from the Chairman and suggested that the Chairman's temporary closure order was not a final agency action under the APA. United States v. Santee Sioux Tribe of Nebraska, 135 F.3d 558, 561 (8th Cir.), cert. denied, 525 U.S. 813 (1998). Although Santee Sioux did not require us to squarely address whether APA review of a temporary closure order is permissible, we stated that such an order does not become final for purposes of review until after the NIGC as a whole upholds the closure order on administrative appeal: "The District Court dismissed the Tribe's case . . . holding that the Chairman's temporary closure order was not final agency action subject to judicial review. . . . [Later,] the NIGC upheld on appeal the Chairman's order of temporary closure, whereupon that order became final." Id. The Santee Sioux court accurately described the interim nature of the Chairman's temporary closure order. The Chairman's order in the present case, as in Santee Sioux, was not final.

The Appointed Counsel argues in the alternative that, even if administrative exhaustion generally is required under the IGRA, it was not required in this case because the exhaustion requirement exception set forth in McCarthy v. Madigan, 503

-12-

U.S. 140 (1992), applies.[1]  We disagree.  The Court in McCarthy permitted a prisoner's constitutional tort claim to proceed against prison officials notwithstanding the prisoner's failure to exhaust his administrative remedy through the prison's grievance system.  Id. at 156.  The Court first noted the need to defer to Congress regarding exhaustion of administrative remedies where Congress expressly delegates responsibility over a program to an administrative agency.  Id. at 145.  The Court further noted that it is not necessary to exhaust administrative remedies in situations where "'the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.'"  Id. at 146 (quoting West v. Bergland, 611 F.2d 710 (8th Cir. 1979)).  The Court proceeded to identify three general scenarios under which the litigant's interest would outweigh the need for administrative review:  where an exhaustion requirement would "occasion undue prejudice to subsequent assertion of a court action"; where administrative remedy may be inadequate because there is "some doubt as to whether the agency was empowered to grant effective relief"; and third, "where the administrative body is shown to be biased or has otherwise predetermined the issue before it."  Id. at 146-48 (citations and internal quotations omitted).

Here, the exception of McCarthy does not apply.  Not only did Congress delegate authority to the NIGC and the Chairman, Congress itself created the detailed administrative review process at issue in this case.  Accordingly, deference to Congress militates against our exemption of the Appointed Council's claims from administrative exhaustion.  Further, none of the three scenarios that the Court

---

[1]We note that, in the context of prisoners' claims, McCarthy has been superseded by statute.  See 42 U.S.C. § 1997(e)(a) (expressly providing that prisoners may not bring § 1983 actions regarding prison conditions "until such administrative remedies as are available are exhausted").  The rule of McCarthy, however, remains valid outside of the prisoner context.  See, e.g., United States v. Dico, Inc., 136 F.3d 572, 576 (8th Cir. 1998).

-13-

identified as excusing a failure to exhaust applies in the present case. There has been no showing of agency bias, there has been no suggestion that requiring exhaustion might preclude later judicial review, and the NIGC is clearly empowered to grant relief.

Finally, the Appointed Council attempts to establish jurisdiction by characterizing its challenge to the Chairman's order as a constitutional tort claim under Bivens, 403 U.S. 388. Framing an attack on the Chairman's actions as a constitutional tort claim does not relieve the Appointed Council of the IGRA's exhaustion requirements. Sinclair v. Hawke, 314 F.3d 934 (8th Cir. 2003). In Sinclair, we recently stated:

> [w]hen Congress has created a comprehensive regulatory regime, the existence of a right to judicial review under the Administrative Procedures Act is sufficient to preclude a Bivens action. See Miller v. U.S. Dep't. of Agric. Farm Servs. Agency, 143 F.3d 1413, 1416 (11thCir. 1998); Maxey v. Kadrovach, 890 F.2d 73, 75-76 (8th Cir. 1989). "[P]arties may not avoid administrative review simply by fashioning their attack on an [agency] decision as a constitutional tort claim against individual [agency] officers." Zephyr Aviation, L.L.C. v. Dailey, 247 F.3d 565, 572 (5th Cir. 2001).

Sinclair, 314 F.3d at 940 (alteration in original). Here, the IGRA provides an administrative review scheme and an express right to appeal the NIGC's action to the courts under the APA. The fact that the IGRA delays APA review until after the NIGC first reviews the actions of the Chairman does not suspend the rule of Sinclair. The Appointed Council cannot maintain a Bivens claim based on the Chairman's action in carrying out his duties. Accordingly, it was not error to dismiss the Appointed Council's Bivens action.

## III. Preliminary Injunction

We next address the district court's May 22 grant of a preliminary injunction to enforce the Chairman's temporary closure order. The United States argues that the injunctive relief is proper because no due process violations occurred in the consolidation and disposition of the cases and because a showing of irreparable harm is unnecessary where the government (rather than a private party) seeks injunctive relief to prevent the violation of a statute or administrative order. The United States argues in the alternative that the district court accurately identified irreparable harm and otherwise correctly applied the equitable factors under Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc) (listing as factors for consideration: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest"). The Elected Council argues that the district court's mootness determination regarding its claims for limited injunctive relief demonstrates that the district court failed to balance the harms in a manner tailored to minimize the impact of the injunction. The Appointed Council argues that the injunction resulted from multiple due process violations. In addition, the Appointed Council argues that the district court abused its discretion in finding there to be irreparable harm.

Because the IGRA does not expressly authorize district court enforcement of the Chairman's temporary closure order, we find that a showing of irreparable harm is required and that Dataphase sets forth the appropriate analytical framework for this case. In addition, we find that the district court did not abuse its discretion in finding irreparable harm and applying the other Dataphase factors. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998) (setting forth an abuse of discretion standard for the review of Dataphase analyses). We address the issues of mootness and the due process challenges in Sections IV and V respectively.

The United States relies on Burlington Northern Ry. Co. v. Bair, 957 F.2d 599 (8th Cir. 1992), to assert that no showing of irreparable harm is required. In Burlington Northern, we declined to apply a balancing of the equities approach in the analysis of a request for injunctive relief. Instead, we stated:

> [i]t is a well-established rule that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate irreparable harm to secure an injunction. In such situations, it is not the role of the courts to balance the equities between the parties. The controlling issue is whether Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits. The proper role of the courts is simply to determine whether a violation of the statute has or is about to occur.

Id. at 601-02 (citing United States v. City of San Francisco, 310 U.S. 16, 31 (1940); Atchison, T. & S.F. Ry v. Lennen, 640 F.2d 255, 259-60 (10th Cir. 1981)).

The United States concedes that Burlington Northern differs from the present case. In Burlington Northern, the relevant statute expressly authorized injunctive relief. The IGRA, on the other hand, does not expressly authorize the use of injunctive relief to enforce the Chairman's temporary closure orders. Accordingly, we must determine whether the rule of Burlington Northern, standing alone, authorizes the district court's injunction against violations of the Chairman's closure order, or whether the absence of express statutory authority for injunctive relief demands that support for injunctive relief exist under some other authority, such as a broader balancing of equitable considerations.

In Santee Sioux, we noted the absence of express statutory authority within the IGRA for enforcement of the Chairman's temporary closure order. 135 F.3d at 562. We did not address the applicability of the Burlington Northern rule under the IGRA.

-16-

We did, however, conclude that the United States could pursue enforcement of the Chairman's orders:

> [w]e cannot imagine that Congress intended to vest in the Chairman and the NIGC the power to assess fines against the tribal operators of the facilities and to order temporary closures of Indian gaming facilities operating in violation of the IGRA without providing for a means to ensure compliance with those decisions. The IGRA's silence on the matter of enforcement of the Chairman's closure orders compels our conclusion that the broad authority to litigate granted to the Attorney General under 28 U.S.C. § 516 envisions the action taken here by the United States Attorney to enforce, on behalf of the NIGC and the United States as an interested party, the Chairman's order demanding that the Tribe close its gaming facility. . . . We conclude . . . that the United States may pursue injunctive relief to ensure the Tribes compliance with the Chairman's closure order.

Santee Sioux, 135 F.3d at 562-63. After finding that injunctive relief was available, we ultimately remanded for the district court to enter an order enjoining violations of the Chairman's temporary closure order. Id. at 566. In reaching that decision, we did not rely on the simple expedient of Burlington Northern. Instead, we looked for other authority that would support the imposition of injunctive relief. The authority we found in Santee Sioux was a state-tribal compact that incorporated by reference a Nebraska statute that authorized courts to enjoin gaming violations. Santee Sioux, 135 F.3d at 565.

Based on the analysis set forth in Santee Sioux, and based on the absence of express statutory authority like that present in Burlington Northern, we find it necessary to look beyond the rule of Burlington Northern in our present analysis. Here, the parties do not identify a state statute that would authorize enforcement of the Chairman's order. Accordingly, reliance on the balancing test of Dataphase is appropriate for analysis of the United States' request for equitable relief.

Applying Dataphase, we look at the public's interest and the balance of the harms caused by a grant of injunctive relief on the one hand, and a failure to grant injunctive relief on the other. On these two factors, we give great weight to the fact that Congress already declared the public's interest and created a regulatory and enforcement framework that balanced the need for regulation against the harm of closure. As noted by the Supreme Court:

> [a] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation. A district court cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all.)

United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 497-98 (2001) (internal citations and quotation marks omitted).

Here, two declared purposes of the IGRA are "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and to "provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(1) and (2). These statements of purpose demonstrate that Congress placed a high priority on the control of gaming to minimize the secondary effects of gambling and to prevent the

-18-

appropriation of the benefits of gaming by unrecognized groups. Congress viewed effective regulation and respect for regulatory authority as being in the public's interest.

Prior to enforcement of the closure order in this case, gaming operations had become, effectively, unregulated. The BIA did not recognize the Appointed Council, yet the Appointed Council had appropriated control of the gaming operations and diverted tribal assets into new bank accounts. As such, it was no longer possible for the NIGC to ensure that the tribe was the primary beneficiary of the gaming operation, that gaming added to the strength of tribal government or tribal economic development, or that gaming supported tribal self-sufficiency. Given the priority that Congress placed on the regulation of tribal gaming, and given the breakdown of regulatory control in the present case, the district court did not abuse its discretion in finding that the public interest favored enforcement of the Chairman's temporary closure order.[2]

Congress has already balanced the harm of closure against the need for regulatory control. The statutory delegation of authority between the Chairman and the NIGC as well as the statutory framework for administrative review illustrate this balance. Congress desired the Chairman to have the ability to act swiftly and effectively cure gaming violations, while at the same time being subject to oversight by the NIGC as a whole to prevent unnecessary harm to tribes and limit the disruption of gaming operations. See 25 U.S.C. § 2713(b)(1) ("The Chairman shall have power to order *temporary* closure of an Indian game . . .") (emphasis added); 25 U.S.C. § 2713(b)(2) (setting forth administrative review procedures); 25 U.S.C. §2713(c) ("A decision by the Commission . . . to order a permanent closure . . . shall be appealable

---

[2] There is nothing in the record to indicate that the Appointed Council was not operating the casino in the best interests of the Tribe. Rather, our concern is with the NIGC's ability to effectively regulate gaming activities.

to the appropriate Federal district court . . ."); 25 U.S.C. § 2714 ("Decisions made by the Commission . . . shall be final agency decisions for purposes of appeal to the appropriate Federal district court . . ."). Were we to interpret the IGRA in a manner that would leave the Chairman unable to enforce a temporary closure order, there would be no need for the congressionally created and balanced system of limited, immediate action followed by administrative or judicial review. We believe, therefore, that the only sensible reading of 25 U.S.C. § 2713(b)(1) requires that we recognize that Congress already conducted the requisite balancing of the harm of closure against the need for temporary enforcement of the Chairman's closure orders. The district court did not abuse its discretion in finding that the balance of the harms weighed in favor granting temporary injunctive relief to enforce the Chairman's order.

Turning to the issue of irreparable harm, we find no error in the district court's analysis. The district court concluded that irreparable harm or the threat of irreparable harm existed in the form of "a debilitation of the NIGC's regulatory role." The irreparable harm found by the district court was not merely prospective, much less "speculative", as argued by the Appointed Council. The irreparable harm identified by the district court was current. The Appointed Council, at all times prior to closure of the casino by the U.S. Marshals, ignored the authority of the NIGC Chairman. The Appointed Council's refusal to abide by the temporary closure order demonstrated an immediate "debilitation of the NIGC's regulatory role."

The district court also referred to a prospective type of harm, suggesting that a failure to enforce the Chairman's temporary closure order in this case would cause other tribes to ignore the Chairman's authority. The Appointed Council argues that this reference demonstrates that the district court relied not upon actual harm or an immediate threat of harm, but rather, the long-term, hypothetical impact that a failure to enforce temporary closure orders might have on the ability of the Chairman and the NIGC to regulate Indian gaming. We do not find that the district court's reference

to prospective harm detracts from the facts of the case at hand. The Appointed Council's own actions demonstrated the debilitation relied upon by the district court.

Similarly, we find no abuse of discretion in the district court's determination that the likelihood of success on the merits weighed in favor of granting injunctive relief. The issue before us relates solely to the enforceability of the Chairman's temporary closure order. Our analysis of the likelihood of success on the merits requires neither a predictive analysis of how the NIGC might resolve the Elected Council's administrative appeal nor speculation regarding the possible outcomes of the current, intra-tribal dispute. Accordingly, we need not consider the relative strengths of the competing councils' claims to authority. Rather, our analysis involves the questions of whether the Chairman acted within the scope of his statutory grant of authority, whether Congress intended the Chairman's temporary orders to be enforceable pending administrative review, and whether the Tribe enjoys sovereign immunity in the regulated field of gaming.

The IGRA grants the Chairman broad authority to fashion remedies to cure perceived gaming violations, including the authority to order temporary closures. 25 U.S.C. § 2713(b)(i). Congress mitigated this broad grant of authority and discretion by limiting the duration of the Chairman's orders and making his orders subject to review and dissolution by the NIGC as a whole. Here, the Chairman's specific action was within the bounds of his statutory grant of authority. Further, because the Chairman reasonably could have perceived the Appointed Council's appropriation and operation of the casino as a gaming violation, the present case does not present facts that involve wholly irrational or arbitrary and capricious action by the Chairman. Accordingly, we cannot find that he acted outside the scope of his authority.

The Tribe's statutory grant of a right to conduct gaming is conditional. As noted by the district court, "[a]ny tribe which elects to reap the benefits of gaming authority created by the IGRA must comply with the IGRA's requirements." In other

words, the Tribe does not enjoy sovereign immunity in matters of gaming regulation. This is true not only generally, but also in the specific context of temporary closure orders. See Santee Sioux, 135 F.3d at 566 (enforcing a temporary closure order after finding that Congress intended such orders to be enforceable). Because our analysis of the likelihood of success on the merits is a limited analysis, and because the United States is likely to prevail on the merits against any challenges based on the scope of the Chairman's authority or Tribal sovereign immunity, we agree with the district court's conclusion that this final Dataphase factor supports enforcement of the Chairman's order.

Because we find that Dataphase applies and the district court did not abuse its discretion in the application of Dataphase, we affirm the district court's grant of injunctive relief. As explained below, however, we remand for the district court to consider whether our reversal of the dismissal of the Elected Council's intervenor claim under the IGRA requires modification of the preliminary injunction. See, e.g., Nat'l Basketball Ass'n v. Minnesota Prof'l Basketball, L.P., 56 F.3d 866, 872 (8th Cir. 1995) (noting the interlocutory nature of appeals from preliminary injunctions) and Haz. Waste Treatment Council v. South Carolina, 945 F.2d 781, 795 (4th Cir. 1991) (remanding for the district court to consider modification of the scope of a preliminary injunction).

IV. Mootness of the Elected Council's Claims as Intervenor

In the May 22 order, after dismissing the Appointed Council's claims and granting the preliminary injunction, the district court dismissed the Elected Council's intervenor claims as moot. These claims included a state law trespass claim against the Chairman and the Appointed Council, a claim seeking to enjoin, among other things, illegal gaming under 25 U.S.C. § 2710(d)(7)(A)(ii), and a claim seeking to enjoin the Chairman's enforcement of his closure order. The Elected Council (as intervenor) argues that the district court possessed subject matter jurisdiction to

address these claims, that these claims were not moot, and that dismissal of these claims shows that the district court improperly failed to consider the Elected Council's suggestions for a more limited form of injunctive relief when balancing the harm to the litigants against the need for the injunction.

We agree that the district court should have addressed the Elected Council's IGRA claim. 25 U.S.C. § 2710(d)(7)(A)(ii) expressly provides jurisdiction for the court to enjoin illegal gaming. Id. ("The United States district courts shall have jurisdiction over . . . any cause of action initiated by a[n] . . . Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect . . ."). The Elected Council articulated a justiciable claim under § 2710(d)(7)(A)(ii). To the extent that the relief the Elected Council sought under the IGRA may have differed from the relief granted to the United States, the IGRA claim was not moot. Accordingly, as to the Elected Council's IGRA claim, we remand for further proceedings including consideration of whether the viability of the Elected Council's IGRA claim requires modification of the current injunction. See Porter v. Warner Holding Co., 328 U.S. 395, 398-99 (1946) (noting that the district court may exercise all of its equitable powers in an agency enforcement proceeding); Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944) (noting that where two parties present competing claims of injury, the court may exercise its equitable power to reach a "nice adjustment and reconciliation" between the competing claims).[3]

We disagree with the district court's conclusion that the Elected Council's trespass claim and claims for relief that reached beyond the Tribe's gaming enterprise (e.g. claims seeking the return of Tribal government facilities to the Elected Council)

_____

[3]We express no opinion on the merits of this claim. We also recognize that the dispute is very fluid and the facts as presented to the district court in May may be significantly changed by intervening events.

-23-

were moot. Many elements of the relief sought by the Elected Council through these claims were unrelated to gaming, and, therefore, unrelated to the injunctive relief granted to the United States. Enforcement of the Chairman's order did not moot the Elected Council's claims related to Tribal accounts or Tribal government facilities.

The fact that these claims were not moot, however, does not mean that the federal courts have jurisdiction. Here, the non-IGRA claims are non-justiciable for another reason. They seek a form of relief that the federal courts cannot provide, namely, resolution of the internal tribal leadership dispute.

Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts. See United States v. Wheeler, 435 U.S. 313, 323-36 (1978) (noting that Indian tribes are "'unique aggregations possessing attributes of sovereignty over both their members and their territory'" and holding that a tribe possessed the power to punish its members for violations of tribal laws) (quoting United States v. Kagama, 118 U.S. 375, 381 (1886)); Runs After v. United States, 766 F.2d 347, 352 (8th Cir. 1985) (holding that the district court lacked jurisdiction to resolve "disputes involving questions of interpretation of the tribal constitution and tribal law") (citations omitted); Smith v. Babbitt, 100 F.3d 556, 559 (8th Cir. 1996) (holding that the district court lacked jurisdiction to hear what, in effect, was an appeal by individuals from an adverse tribal membership determination by a tribe). We have characterized an election dispute concerning competing tribal councils as this type of non-justiciable intra-tribal matter. See Goodface v. Grassrope, 708 F.2d 335, 339 (8th Cir. 1983) ("[T]he district court overstepped the boundaries of its jurisdiction in interpreting the tribal constitution and bylaws and addressing the merits of the election dispute."). We find the Goodface court's determination that a district court lacked jurisdiction to intervene in a tribal leadership dispute controlling.

Goodface is instructive. It was an action involving the BIA as a party. A tribal election dispute erupted when a former tribal council refused to recognize the authority of a newly elected tribal council. The BIA in that case ultimately determined that the dispute was an intra-tribal dispute, that the BIA could not intervene, and that the BIA would correspond with both councils on an interim basis in order to provide necessary services to the tribe pending internal, tribal resolution of the dispute. Id. at 339-40. On appeal of the BIA's recognition decision under the APA, the district court examined the tribal constitution and bylaws, addressed the merits of the election dispute, determined that the newly elected council was entitled to recognition, and issued a final order requiring the BIA to recognize the new council. Goodface, 708 F.2d at 339-40.

We reversed the district court's purported final order but instructed the district court to order the BIA to recognize the newly elected tribal council on an *interim* basis. Id. at 340. In addition, we instructed the district court to not enter orders concerning the merits of the election dispute but to defer to a final tribal determination as to leadership. Id. We specifically found that the district court acted without authority when it interpreted the tribal constitution and bylaws and addressed the merits of the election dispute. Goodface, 708 F.2d at 339 ("Although we agree with the district court that the BIA should recognize the 1982 council, at least on an interim basis, the district court should not have addressed the merits of the election dispute in reaching that decision.").

Based on Goodface, then, even if the district court was incorrect in its finding of mootness, the district court was correct to dismiss the intervenor's trespass and other non-IGRA-related requests for relief. Relief unrelated to gaming could only be granted to the extent the court could first resolve the intra-tribal dispute and determine whether the Appointed Council was the rightful governing body of the tribe. We therefore affirm the district court's dismissal of the Elected Council's non-IGRA claims, albeit on other grounds, and remand the Elected Council's IGRA claim

-25-

to the district court for further proceedings and for consideration of whether the viability of this claim requires modification of the injunctive relief.

## V.  Due Process Challenges

The Appointed Council argues on due process grounds that the district court improperly consolidated the Elected Council's claims as intervenor and the NIGC's claims for injunctive relief with the Appointed Council's own claim for injunctive relief, thus depriving the Appointed Council of effective notice and a meaningful hearing.  The Appointed Council also argues that enforcement of the temporary closure order was improper because the Chairman and the NIGC provided no notice of an intent to issue a closure order and because the IGRA requires that a formal complaint from the entire NIGC precede the enforcement of any closure order.  We reject all of these due process challenges.

The IGRA provides that the Chairman may issue temporary closure orders on behalf of the Commission.  25 U.S.C. § 2713(b)(1).  NIGC regulations provide that, "Simultaneously with or subsequently to the issuance of a notice of violation . . . , the Chairman may issue an order of temporary closure . . . if one or more of the following substantial violations are present . . . ."  25 C.F.R. § 573.6(a).  By contrast, § 2713(a)(3) provides that the NIGC "shall provide" a written complaint before ordering "permanent closure."  Accordingly, the plain text of the IGRA and the NIGC regulations envision immediate, swift action by the Chairman.  The Appointed Council's argument that temporary closure must be preceded by a written complaint from the NIGC as a whole is counter to the text of the statute and regulations and counter to the statutory scheme which provides for immediate action by the Chairman followed by a period of administrative review.  The written complaint is a separate safeguard in place to ensure careful deliberation and expanded notice before the imposition of a permanent remedy.

The record belies the Appointed Council's other notice-related claims. Here, even though not required, an NOV did precede the temporary closure order. The NOV demanded that the Appointed Council relinquish control of the casino and, in the section of the NOV regarding appeal, referred to the NOV as a "Notice of Violation and Order of Temporary Closure." Further, an April 28 letter from the Tribe's attorney to the Chairman demonstrates that the Tribe was informed of the NOV and closure order before they were issued: "[w]e write . . . regarding a notice of violation and temporary closure which we have been informed the NIGC is considering." In fact, the letter listed as the subject: "Threatened Temporary Closure of Meskwaki Bingo•Casino•Hotel." Notice of violations sufficient to warrant closure, express reference to closure, and the Tribe's own acknowledgment of possible closure, therefore, preceded the Chairman's issuance of a temporary closure order.

The rest of the Appointed Council's due process argument relies on Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Local No. 70, 415 U.S. 423 (1974). Under Granny Goose, issuance of a preliminary injunction requires reasonable notice and a chance for the respondent party to prepare and respond. Id. at 440-43. While it may have been preferable for the district court to delay the May 19 hearing in light of the parties' last minute filings, we cannot say that the consolidation of matters on May 19 deprived the Appointed Council of reasonable notice, a meaningful hearing, and a chance to respond. Accordingly, any error in the rapid consolidation and disposition of the parties' requests for immediate injunctive relief was without prejudice.

The Chairman issued his temporary closure order on May 12. The violations at issue were set forth in the April NOV. The United States did not request enforcement of the NIGC's closure order until it became clear the Tribe would not comply. When the United States did ask for enforcement, the issue placed before the court was precisely the issue that the Appointed Council, itself, had placed before the

court in its own action, namely, a request for a determination as to the enforceability of the Chairman's temporary order pending NIGC review. All that the United States' action changed was the potential result of the May 19 proceedings, not the substance of the issues before the court. Finally, the district court permitted the parties to file post-hearing briefs, and, the Appointed Council, in fact, submitted a supplemental brief. In light of the identity of issues between the consolidated matters and the Appointed Council's own claims, and in light of the opportunity to present post-hearing briefs, we find any error in the rapid consolidation of these matters to have been harmless.

## VI. April 15 Order

Finally, we address the district court's earlier, April 15 dismissal of the Elected Council's claims for declaratory and injunctive relief. The district court examined the Elected Council's requests for relief, as stated in the complaint and as described at the first district court hearing, and determined that the Elected Council sought district court intervention in an intra-tribal leadership dispute. The district court held that it lacked subject matter jurisdiction to resolve such a dispute. We review the district court's determination as to the existence of subject matter jurisdiction de novo. Gardner v. First Am. Title Ins. Co., 294 F.3d 991, 993 (8th Cir. 2002).

As discussed above, we agree with the district court that jurisdiction does not exist to resolve an intra-tribal leadership dispute. Therefore, our review entails examination of the specific, technical allegations of jurisdiction to ensure that the district court appropriately characterized the actions complained of, and the relief requested, as intra-tribal disputes rather than disputes concerning issues over which jurisdiction would have been proper, namely, gaming regulation, other matters subject to federal regulation, or intergovernmental relations.

-28-

The Elected Council's complaint contains no reference to § 2710(d)(7)(A)(ii), but does make general reference to the IGRA.  The district court correctly determined that the IGRA provides no *general* private right of action.  Hartman v. Kickapoo Tribe Gaming Comm'n, 319 F.3d 1230, 1233 (10th Cir. 2003) (citing Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1049 (11th Cir. 1995)); Hein v. Capitan Grande Band of Diegueno Mission Indians, 201 F.3d 1256, 1260 (9th Cir. 2000)).  As discussed in Section IV, supra, however, the IGRA provides a specific right of action to enjoin illegal gaming.  25 U.S.C. § 2710(d)(7)(A)(ii).  Our review of the complaint and the transcript of the first district court hearing as well as our own search for legal authority to fit the allegations of the Elected Council's complaint convinces us that the only possible basis that might support jurisdiction over the Elected Council's claims on the present facts would be § 2710(d)(7)(A)(ii). See Bramlet v. Wilson, 495 F.2d 714, 716 (8th Cir. 1974) ("[A] complaint should not be dismissed merely because [the] allegations do not support the particular legal theory [advanced], for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory.") (citation omitted). Because we already determined that the Elected Council's intervenor claims raised a justiciable issue under §2710(d)(7)(A)(ii), however, we need not decide whether the Elected Council's earlier-filed action also raised such claims.

The Elected Council also asserted two requests for injunctive relief under RICO.  18 U.S.C. § 1964 provides jurisdiction over civil actions brought by aggrieved parties to prevent or restrain racketeering activity as defined under 18 U.S.C. § 1962(c).  Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a claim under § 1962(c), a plaintiff must establish (1) the existence of an enterprise; (2) conduct by the defendants in association with the enterprise; (3) the defendants' participation in at least two predicate acts of racketeering; and (4) conduct that constitutes a pattern of racketeering activity. United Healthcare Corp. v. American Trade Ins. Co., 88 F.3d 563, 570 (8th Cir. 1996). The district court found that the predicate violations alleged by the Elected Council could not be considered qualifying predicate violations unless the court first concluded that the Appointed Council was not the lawful governing body of the Tribe. In the alternative, we note that to define the Appointed Council as an "enterprise" separate from the Tribe itself we would first have to conclude that the Appointed Council does not, in fact, represent the Tribe. The district court lacked subject matter jurisdiction to decide these underlying, intra-tribal matters. We therefore agree that the district court lacked subject matter jurisdiction over the Elected Council's claims and affirm the district court's April 15 order.

In summary, we:

(1)     affirm the district court's May 22 dismissal of the Appointed Council's claims for failure to exhaust administrative remedies;

(2)     affirm the district court's May 22 enforcement of the Chairman's temporary closure order;

(3)     reverse the district court's May 22 dismissal of the Elected Council's intervenor claim under 25 U.S.C. § 2710(d)(7)(A)(ii);

(4)     affirm the district court's May 22 dismissal of the Elected Council's remaining claims;

(5)     affirm the district court's April 15 dismissal of the Elected Council's claims.

-30-

We remand to the district court for further proceedings consistent with this opinion including reconsideration of the scope of injunctive relief in light of our reinstatement of the Elected Council's IGRA claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.