**UNITED STATES of America, Plaintiff,**

v.

**XCEL ENERGY, INC., Northern States Power Minnesota, and Xcel Energy Services, Inc., Defendants.**

**Civil No. 10–2275 (PAM/JSM).**

United States District Court, D. Minnesota.

Sept. 27, 2010.

Friedrich A.P. Siekert, United States Attorney's Office, Minneapolis, MN, Justin A. Savage, Katherine L. Vanderhook, Thomas A. Benson, U.S. Department of Justice, Washington, DC, for Plaintiff.

Molly Borg Thornton, Timothy R. Thornton, Briggs & Morgan, P.A., Minneapolis, MN, Debra Jezouit, William Bumpers, Baker Botts LLP, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction and Defendants' Motion to Dismiss. For the reasons that follow, Plaintiff's Motion is granted and Defendants' Motion is denied.

## BACKGROUND

### 1. Facts

Defendants include Xcel Energy, Inc., a multi-billion dollar, publicly traded utility holding company headquartered in Minneapolis, Minnesota. Xcel has four wholly owned subsidiaries, including Northern States Power–Minnesota ("NSP") and Xcel Energy Services, Inc., which are named defendants in this case. NSP provides electric services to 1.4 million customers in Minnesota and the Dakotas. Xcel Energy Services, Inc. provides administrative and technical support for NSP and other subsidiaries.[1] (Kahal Decl. ¶¶ 15–17.)

Xcel owns several power plants across eight different states. Questions about alleged projects at two such plants, Sherburne County ("Sherco") and Black Dog, located in Becker and Burnsville, Minnesota, respectively, are at issue in this case. At present, Sherco has three coal-fired units ranging from 750 to 900 megawatts in size, and Black Dog has two coal-fired units rated at 120 and 186 megawatts. Both plants emit vastly more pollutants than is necessary to be classified as "major emitting facilities" under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq. See 42 U.S.C. § 7479(1); Chatfield Decl. ¶¶ 11–12.

This action is centered on information requests issued by the Environmental Protection Agency ("EPA") to Xcel pursuant to Section 114 of the CAA. EPA issued ten such information requests to Xcel and its subsidiaries on July 27, 2009. (Chatfield Decl. Ex. C.) Xcel responded adequately to eight of the ten requests; the two at issue here are requests 6 and 10. Request 6 sought, in part, documents regarding future capital projects at the Sherco and Black Dog plants within the next five years. Request 10 sought, in part, documents and a description of "planned additional generation capacity installations" within the next ten years. (*Id.*) Xcel objected to the demands contained in requests 6 and 10, stating that

> Xcel Energy is not producing documents related to projects that have not been implemented or completed at the [Black Dog and Sherco] Stations. EPA's request for such information exceeds the scope of EPA's authority under Section 114 of the CAA because it cannot assist EPA to determine whether Xcel Energy *is* in violation of the CAA.

(*Id.*)

Subsequently, on September 22, 2009, EPA again requested the information in requests 6 and 10. (*Id.* Ex. D.) Xcel Energy refused to comply. (*Id.* Ex. E.) EPA again contacted Xcel on January 8, 2010, and demanded that the company comply with requests for information concerning future capital projects. Additionally, EPA noted that it had learned, from information Xcel had provided EPA via the Minnesota Public Utilities Commission since the parties' previous exchange, that Xcel was planning a specific "uprate/capacity expansion" project on Unit 3 at the Sherco Plant. Thus, EPA also requested specific information on that project. (*Id.* Ex. F.)

Xcel replied on January 28, 2010, and reiterated that it would not provide information on future capital projects at either Sherco or Black Dog. Xcel also stated that the Sherco uprate project remained uncommitted and therefore Xcel refused to

---

**1.** Defendants will be referred to collectively as "Xcel."

submit documentation prior to commencing "actual construction." Additionally, Xcel claimed that providing information on future projects would present an unreasonable burden. (*Id.* Ex. G.)

EPA contacted Xcel again on March 2, 2010; this time, however, EPA narrowed its information request to only those capital projects planned for construction at Black Dog and Sherco two years hence. EPA also stated that Xcel could then provide periodic updates on projects planned for the remainder of the five-year period. EPA went on to explain that a two-year request window was reasonable because a permit application must be submitted prior to construction, and permit approvals take, at a minimum, eighteen months to two years.[2] (*Id.* Ex. H.) In response, Xcel again rebuffed EPA, citing the fact that capital projects at Sherco and Black Dog were "potential projects" that "may never be implemented." (*Id.* Ex. I.) Yet EPA contends that Xcel had, just a few days earlier, told investors that it planned to spend $15 million in 2010 on Sherco and $10 million on Black Dog repowering in 2012. (Mem. Supp. Pl.'s Mot. for Prelim. Inj. at 11 [hereinafter "Pl.'s Supp. Mem."].) The United States, on behalf of EPA, then filed suit to enjoin Xcel to produce the requested documentation and to order Xcel to pay a civil penalty fee of $37,500 per day for each violation, as authorized by statute. 42 U.S.C. § 7413(b); Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, *amended by* 31 U.S.C. § 3701.

### 2. Statutory Authority

Congress enacted the CAA "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The CAA required EPA to establish national ambient air quality standards ("NAAQS") that specify the maximum permissible concentration of air pollutants in different areas of the country. *Id.* § 7409. States must then develop plans to comport with the NAAQS, called State Implementation Plans, that regulate individual sources of air pollution. *Id.* § 7410(a)(1)-(2).

The New Source Review ("NSR") program was enacted to address newly constructed or modified pollutant-emitting facilities' impact on air quality. There are two parts to the NSR program; the first part encompasses those areas that have attained NAAQS standards, dubbed the Prevention of Significant Deterioration ("PSD"), *id.* §§ 7470–7479, while the second part addresses those areas that have failed to attain such standards. *Id.* §§ 7501–7515. Because Minnesota has attained NAAQS standards, only the PSD program applies in this case.

The PSD program prohibits major emitting facilities (such as Sherco and Black Dog, *see id.* § 7479(1)), from being constructed without first obtaining a PSD permit. *Id.* § 7475(a)(1). "Construction" is defined within the CAA as both newly constructed facilities and modifications to existing facilities. *Id.* § 7479(2)(C). Not all modifications are subject to the permit-

---

**2.** Although the CAA demands that "[a]ny completed permit application ... for a major emitting facility in any area to which [the Prevention of Significant Deterioration program] applies shall be granted or denied not later than *one year* after the date of filing of such completed application," 42 U.S.C. § 7475(c) (emphasis added), neither party addresses this inconsistency. For the purposes of this Order, this Court will thus accept that the eighteen month-to-two-year time range for permit approval is accurate and use it as a basis for the analysis below.

ting requirements, however; EPA has required only those that constitute "major modifications" to obtain permits before construction commences. 40 C.F.R. § 52.21(a)(2). Construction "commences" when a major emitting facility has

(i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or

(ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

42 U.S.C. § 7479(2). Finally, a "major modification" is defined as "any physical change in or change in the method of operation of a major stationary source[3] that would result in: a significant emissions increase ... of a regulated NSR pollutant ... and a significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. § 52.21(b)(2).

In order to enforce the PSD program, EPA "shall ... take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of [PSD]." 42 U.S.C. § 7477. To assist in enforcement, the CAA authorizes EPA to demand such information as it "may reasonably require" to "determin[e] whether any person is in violation of any such standard or any requirement of such a plan, or [to] carry[ ] out any provision of this chapter." *Id.* § 7414(a). Additionally, EPA may seek an injunction or civil penalty for any source that refuses to comply with the foregoing demands for information. *Id.* § 7413(b).

## DISCUSSION

This discussion will first address EPA's Motion for Preliminary Injunction, and then Defendants' Motion to Dismiss.

### 1. EPA's Motion for Preliminary Injunction

 This Court must analyze whether EPA is entitled to preliminary injunctive relief. In determining whether to grant an injunction, the Court must consider the four *Dataphase* factors: (1) the threat of irreparable harm to the moving party, (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties, (3) the probability that the moving party will succeed on the merits, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981). Further, the Court recognizes that "[t]he burden on the movant 'is a heavy one where, as here, granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits.'" *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir.1993) (quoting *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir.1991) (second alteration in original)). Because it entails the most detailed analysis, the Court will first consider the probability of success on the merits.

### a. Likelihood of Success on the Merits

As the court in *Dataphase* noted, when considering this factor, "the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

---

**3.** A "major stationary source," as defined at 40 C.F.R. § 52.21(b)(1), is the functional equivalent of a "major emitting facility" as defined at 42 U.S.C. § 7479(1). As noted above, both the Sherco and Black Dog plants fall within this classification.

■ At the outset, the Court notes that traditional deference to an agency in administrative enforcement proceedings weighs heavily in EPA's favor. *EEOC v. Schwan's Home Serv.*, 707 F.Supp.2d 980, 986 (D.Minn.2010) (Tunheim, J.) ("These 'administrative subpoena enforcement actions are summary proceedings and involve limited judicial review.'" (quoting *EEOC v. United Parcel Serv.*, No. 06–mc–42, 2006 WL 3712941, at *2 (D.Minn. Sept. 1, 2006) (Nelson, Mag. J.))). Yet an agency must still demonstrate that its subpoena was "(1) issued pursuant to lawful authority, (2) for a lawful purpose, (3) requesting information relevant to the lawful purpose, and (4) the information sought is not unreasonable." *Fresenius Med. Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008) (citing *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 226 (8th Cir. 1984)).

Before commencing the subpoena analysis, however, this Court must determine the scope of the information requested. Initially, EPA's requests seemed to include not only Xcel's future projects at Sherco and Black Dog (request 6), but *all* of Xcel's future projects for a two-year period, with the additional requirement of updating EPA on a rolling one-year basis over the next five years (request 10). (*See* Chatfield Decl. Ex. H.) But at oral argument EPA's counsel stated that "[o]ur requests are limited to Sherco and to the Black Dog plants, not any other plants, and our requests are limited to existing documents." (Hr'g Tr. at 30; *see also* Hr'g Tr. at 4 (stating that the requests are limited to "existing documents on actual capital construction or planned imminent construction"); Pl.'s Supp. Mem. at 25 (describing EPA's motion as "narrow," and limiting the requested injunctive relief to documents detailing "capital projects planned

at the Black Dog and Sherco plants").) This Court will take counsel at his word and analyze requests 6 and 10 as applied to existing documentation on future projects at Sherco and Black Dog over the next two years.

#### (i) Lawful Authority

EPA has valid statutory authority under the CAA to subpoena any documentation that it may "reasonably require" in determining whether a violation has occurred. 42 U.S.C. § 7414(a). As EPA correctly argues, this statutory authority provides it with broad discretion indeed. Yet this Court may only defer to EPA's construction of such authority "[i]f the agency interpretation is not in conflict with the plain language of the statute." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 292, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)).

First, in support of its statutory construction, EPA argues that, pursuant to the CAA, it may subpoena documentation to determine "whether any person is in violation" of the CAA's requirements. 42 U.S.C. § 7414(a)(i). EPA states that, although this provision is framed in the present tense, this Court should apply the future tense as well, thus allowing EPA to inquire as to whether any person *will be* in violation of the CAA. (Pl.'s Supp. Mem. at 16.) In support, EPA cites the Dictionary Act, 1 U.S.C. § 1, to wit, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise ... words used in the present tense include the future as well as the present."

■ But EPA confuses the issue by citing to instances in which its authority to regulate preconstruction activities has been allowed. Nowhere does it point to a case where its authority to regulate has been upheld *before* construction commences on a facility.[4] EPA and Xcel hag-

4. As noted earlier, "commencing construc- tion" as defined by the CAA is not limited to

gle over whether EPA's authority begins only on actual construction or during pre-construction as well. The answer is simple: Xcel cannot violate the CAA until it "commences construction;" therefore, EPA may subpoena documentation to assist in determining whether construction has "commenced" within the meaning of § 7414(a)(i). Any exercise of authority beyond this point is superfluous to the statutory conveyance.[5] Thus, this section of the CAA does not give EPA the authority it seeks in this situation.

■ Second, EPA argues that the broad grant of authority given it to seek information for carrying out *any* provision of the CAA allows for the document requests at issue in this case. 42 U.S.C. § 7414(a)(ii). To illustrate its assertion, EPA cites a selection taken from Section 167 of the CAA that "grants broad discretion for EPA to 'take such measures, including issuance of an order, or seeking injunctive relief, as necessary *to prevent the construction or modification of a major emitting facility* which does not conform to the requirements of [PSD]....'" (Pl.'s Supp. Mem. at 16 (quoting 42 U.S.C. § 7477) (alterations in original).)

Unlike above, Section 167 presents no limitation on *when* the EPA's authority commences; it merely requires EPA to prevent a non-conforming construction or modification. Xcel again argues that, because the phrase "does not" is in the present tense, only existing violations maybe be investigated by EPA. Yet in this instance such an argument is unpersuasive because the foregoing phrase "to prevent the construction or modification" clearly accords EPA the authority to investigate, and then to prevent through appropriate legal remedies, violations committed before construction commences.

The only question is whether the scope of EPA's request in this case is "necessary" pursuant to § 7414(a)(ii). EPA has articulated a very practical rationale for its demands: because the permitting process takes up to two years, any project that Xcel has scheduled within that timeframe must be analyzed for potential emissions increases forthwith if construction is to begin on time. (Hr'g Tr. at 11–12; Chatfield Decl. ¶ 10, Exh. H.) Thus, this is an instance in which this Court must defer to reasonable agency interpretation, *see Nat'l R.R. Passenger Corp.*, 503 U.S. at 417, 112 S.Ct. 1394, because the agency is in the best position to determine the quantity of information it needs in order to carry out its regulatory function. EPA has therefore established that its requests for information are within the scope of the CAA.

### (ii) Lawful Purpose

Title I of the CAA, which governs this dispute, lists as its "primary goal" a desire "to encourage or otherwise promote reasonable Federal, State, and local governmental actions ... for pollution prevention." 42 U.S.C. § 7401(c). EPA contends, and Xcel does not dispute (nor

---

projects with "shovels in the ground." It also includes "entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time." 42 U.S.C. § 7479(2).

5. EPA points to Supreme Court precedent that is seemingly in its favor. (*See* Pl.'s Supp. Mem. at 13–14.) For example, EPA cites

*United States v. Morton Salt Co.*: "[An administrative agency] can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." 338 U.S. 632, 642–43, 70 S.Ct. 357, 94 L.Ed. 401 (1950). Yet this only further supports the point made above, namely, that EPA's authority to issue administrative subpoenas is concomitant with its investigatory powers in determining whether there *is* a violation of law that is occurring.

could it credibly dispute from the available information), that EPA's information requests at issue were demanded commensurate with that primary goal; specifically, for the lawful purpose of preventing PSD violations. Thus, this Court finds that EPA's informational demands were issued pursuant to a lawful purpose.

### (iii) Relevance to the Lawful Purpose

EPA's information requests satisfy this prong if they "are 'reasonably relevant to an authorized investigation.'" *Fresenius*, 526 F.3d at 375 (quoting *EEOC v. Technocrest Sys., Inc.*, 448 F.3d 1035, 1040 (8th Cir.2006)). Xcel argues that because EPA's request numbers 6 and 10 seek only "planning" information, they are not relevant to a lawful purpose. As outlined below, however, Xcel's arguments give short shrift to EPA's broad subpoena authority delineated in the CAA.

■ First, both in its briefs and at oral argument, Xcel made much of the fact that CAA violations cannot occur until "actual construction" on project begins, and, therefore, that EPA may not demand documentation on projects that are merely being planned. (*E.g.,* Hr'g Tr. at 16–24; Mem. Supp. Defs.' Mot. to Dismiss and in Opp'n to Pl.'s Mot. for Prelim. Inj. at 21–25 [hereinafter "Defs.' Supp. & Opp'n Mem."].) Yet the phrase "actual construction" is not defined in the CAA; rather, it is used in EPA regulations to clarify instances in which permitting requirements are necessary. 40 C.F.R. § 52.21(a)(2)(iii), (b)(11); *see also Hempstead Cnty. Hunting Club v. Sw. Elec. Power Co.*, No. 08–CV–4038, 2008 WL 2705570, at *3 (W.D.Ark. July 10, 2008) ("[I]n order for an activity to be considered "actual construction" and, thus, prohibited without a PSD permit, it must 1) be physical; 2) occur onsite; 3) be on an emissions unit; and 4) be permanent in nature."). As explained above, EPA's subpoena power under the CAA is not limited to inquiring

into whether permitting requirements have been violated. Indeed, EPA's powers under the CAA include "prevent[ing] the construction or modification of a major emitting facility which does not conform to the requirements of [PSD]." 42 U.S.C. § 7477. Such powers may extend—to a degree—to a time even before the permitting process has begun. Thus, Xcel's argument that EPA may only inquire into projects that have actually commenced is unavailing.

Second, Xcel argues that "[i]t is impossible for EPA to use the requested information to determine Xcel Energy's compliance with PSD." (Defs.' Supp. & Opp'n Mem. at 25.) But this argument again shortchanges EPA's statutory authority. As stated above, pursuant to the CAA, EPA may request information reasonably necessary to prevent a PSD violation before it occurs. *See* 42 U.S.C. §§ 7414(a)(ii), 7477. Whether a violation actually exists at the time of the request is irrelevant to this analysis, and thus Xcel misconstrues the breadth of EPA's authority.

■ In short, Xcel seems to prod this Court to reduce the relevance prong to the following: EPA's information requests will not, in this instance, uncover any existing CAA violation and therefore are not relevant. But this is an inapt application of the relevance prong. Rather, the analysis should hinge on whether EPA's information requests, in this instance, *could* uncover an *existing or imminent* CAA violation. If the answer is "yes," then, pursuant to EPA's broad authority under the CAA, any information that is subpoenaed is relevant for a lawful purpose. Such is the case in this instance, and thus EPA's requests satisfy this prong of the analysis.

### (iv) Reasonableness of Requests

■ The scope of the requests, as modified to include projects at Sherco and

Black Dog only two years hence, is reasonable. First, EPA is justified in asking for two years' worth of construction plans on Sherco and Black Dog because, as noted above, such a demand would afford the agency adequate time in which to analyze the potential emissions impact of a given project. (Hr'g Tr. at 11–12; Chatfield Decl. ¶ 10, Exh. H.) Indeed, a permit application, if necessary, is imminently forthcoming within two years of commencing construction because of the time it takes for approval. If a permit application is unnecessary, then calculations to that effect have surely already been completed and could easily be made available to EPA. A utility company's commitment level to a future project should be great, and the paperwork for emissions calculations and permit approvals (if necessary) sufficiently generated, to justify requests like EPA's.

This Court hastens to add, however, that EPA's original request for five years' worth of construction plans presents a different matter altogether. As articulated by Xcel's counsel at oral argument, EPA must refrain from attempting to gain a seat at the "planning and approval table." (Hr'g Tr. at 37.) Indeed, this Court recognizes that Xcel is a private entity with whom EPA may not "partner in the planning process," *id.;* Xcel alone may decide when and how a project goes forward (pending permit approval, as required). Any attempt by EPA to gain access to a company's planning table will not be looked on favorably by this Court.

Second, Xcel argues that EPA's requests concerning future projects are excessively broad and may cover anything from "informal email exchanges ... to formal presentations." (Defs.' Supp. & Opp'n Mem. at 28.) Although Xcel's concern is certainly noteworthy, it is misplaced be-

cause such broad demands are common in the industry and are within EPA's broad statutory authority. Indeed, nowhere does the CAA limit the type of records for which EPA may ask, and the CAA's broad conveyance of authority almost certainly encompasses even informal documentation. *See* 42 U.S.C. § 7414(a)(iii) (granting EPA authority to require major emitting facilities to "establish and maintain such records, make such reports, ... and provide such other information as [EPA] may reasonably require"). So long as EPA's requests are constrained such that they do not become attempts to gain a seat at Xcel's planning table, EPA has the liberty to decide what types of document it desires.[6]

Nevertheless, in this case, EPA targets only specific information pertaining to Black Dog and Sherco; indeed, EPA has limited its request to only "existing documents on actual capital construction or planned imminent construction." (Hr'g Tr. at 4; *see also* Pl.'s Supp. Mem. at 25.) Such a request is well within the bounds of EPA's authority and presents Xcel with a reasonably ascertainable document production requirement, particularly given the limited two-year duration. Thus, Xcel's argument fails on this point.

### (v) Conclusion

Requests 6 and 10 of EPA's administrative subpoena, as construed above, were validly issued and thus EPA is likely to succeed on the merits of its claim.

### b. Irreparable Harm

Having established a likelihood of success on the merits, EPA must next demonstrate that a sufficient threat of irreparable harm will result without injunctive relief and that such harm is not compensa-

---

**6.** Furthermore, as attested to by Ethan Chatfield, EPA's engineer, "[a] typical response from a utility to EPA's information request involves tens of thousands of pages of documents." (Chatfield Decl. ¶ 8.)

ble by money damages. *Roberts v. Van Buren Pub. Sch.,* 731 F.2d 523, 526 (8th Cir.1984). In *In re Sac & Fox Tribe,* the Eighth Circuit upheld the district court's conclusion "that irreparable harm or the threat of irreparable harm existed in the form of 'a debilitation of [an agency's] regulatory role.'" 340 F.3d 749, 761 (8th Cir.2003) (quoting *Sac & Fox Tribe v. United States,* 264 F.Supp.2d 830, 841 (N.D.Iowa 2003)). Such harm must be immediate, but a consideration of prospective harm is not fatal. *See id.*

■ In this case, there is little doubt that EPA's regulatory function will be denigrated if it is not allowed access to the documentation it seeks. As stated previously, "a PSD permit application needs to be submitted to the permitting authority far in advance of construction commencement and that permitting process can take at a minimum . . . 18 months to 2 years." (Chatfield Decl. ¶ 20 (quotation marks omitted).)[7] Additionally, "based on [EPA's] extensive investigations of the utility industry, numerous other documents would have to have been created for a project to be implemented with two years. . . ." (*Id.*) Furthermore, it appears that EPA has obtained reliable information that construction on Sherco and Black Dog either has commenced or is imminent. (Kahal Decl. ¶ 19, app. C.) Thus, EPA has a pressing interest in exercising its regulatory authority in this case. Indeed, were the Court to deny relief, "EPA [could] not show a projected 'emissions increase' under PSD that might harm the environment when Xcel denies the government access to the relevant documents." (Pl.'s Mem. Opp'n to Mot. to Dismiss and Reply on Mot. for Prelim. Inj. at 19.) EPA's regulatory authority, which was explicitly granted to prevent construction and modification of nonconforming major emitting facilities, would be irreparably harmed absent injunctive relief.

### c. Balance of Harms

■ This next prong requires the Court to balance the harm to the moving party, outlined above, with the harm to the non-moving party that would occur should an injunction be issued. Xcel argues that requiring it to turn over all documents related to every project under consideration for the next two years would create a substantial burden. It states that it will "be forced to devote significant time and energy to gathering and producing information about projects that may never happen." (Defs.' Supp. & Opp'n Mem. at 36.) Additionally, Xcel argues that disclosing the information at issue will result in the surrender of confidential work product that will harm its business interests. *Id.*

First, whether a project may or may not go forward is beside the point. As addressed above, EPA has the broad authority to prevent construction or modification of a major emitting facility that does not conform to PSD requirements. Although the sole decision on whether to go forward with a given project rests with Xcel, EPA must be allowed some liberty to inquire into the details of planned projects in order to properly exercise its regulatory authority.

Second, it defies credulity to suggest that EPA's document requests present the enormous burden Xcel would have the Court believe. Xcel has not explained in any detail how it would be burdened by EPA's requests. Indeed, as EPA points out, the "[r]equests only compel production

---

7. Indeed, as EPA notes, the "permitting process includes notifying the public, EPA, and federal land managers of the proposed modifications, so that they may comment upon the air quality impacts of the modifications and other matters." (Pl.'s Supp. Mem. at 22 (citing 42 U.S.C. § 7475(a)(2), (d)).)

of documents that exist already in [Xcel's] files." (Pl.'s Supp. Mem. at 25.) Furthermore, Xcel is a multi-billion dollar corporation that employs more than 11,000 full-time employees, and NSP accounted for a significant percentage of Xcel's 2009 financial results. In the absence of any specific argument to the contrary, it is eminently reasonable to expect such a large corporation to be able to comply with the document requests at issue in this case.

Finally, any concern about confidential business information leaks is allayed by relevant EPA regulations. Those regulations allow companies to specify certain documents as "confidential business information," which then prohibits EPA from releasing such documents to the public "unless [EPA] makes a contrary determination as part of a detailed administrative review process that includes notice to the submitter of the documents." (*Id.* at 20 (citing 40 C.F.R. pt. 2).) Xcel's concern about the release of confidential information may be addressed by EPA's administrative review process, and thus is inapposite in this proceeding.[8]

### d. Public Interest

Courts must "give great weight to the fact that Congress already declared the public's interest and created a regulatory and enforcement framework that balanced the need for regulation against the harm [to the regulated entity]." *In re Sac & Fox Tribe,* 340 F.3d at 760. Indeed, "Congress ... vested EPA with explicit and sweeping authority to enforce CAA 'requirements' relating to the construction and modification of sources under the PSD program...." *Alaska Dep't of*

*Envtl. Conservation v. EPA,* 540 U.S. 461, 490, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004). Thus, EPA's ability to exercise its legitimate regulatory authority is of paramount importance to the public at large, and must be given great weight under this prong. Conversely, as the First Circuit has noted, " '[s]ome burden on subpoenaed parties is to be expected ... in furtherance of [an] agency's legitimate inquiry and the public interest,' and must be borne as a cost of doing business." *United States v. Tivian Labs., Inc.,* 589 F.2d 49, 55 (1st Cir.1978) (quoting *FTC v. Texaco, Inc.,* 555 F.2d 862, 882 (D.C.Cir.1977)). The public interest factor thus weighs heavily on EPA's side when, as in this case, it exercises legitimate authority pursuant to the CAA.

### e. Conclusion

By satisfying all prongs of the analysis as discussed above, EPA has established that it is entitled to a preliminary injunction.

### 2. Defendants' Motion to Dismiss

Xcel moves this Court to dismiss EPA's claim for failure to state a claim on which relief may be granted. For the purposes of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court takes all facts alleged in the complaint as true. *See Westcott v. Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990). The Court must construe the allegations in the complaint and reasonable inferences arising from the complaint favorably to the plaintiff and will grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle

---

**8.** Xcel complains in a footnote that information identified as confidential "provides little guarantee that EPA will protect the information," then cites as an example an exhibit attached to Ethan Chatfield's declaration that is marked as confidential. (Defs.' Supp. & Opp'n Mem. at 36 n. 4.) Yet, as noted above,

not all documents marked as confidential will be deemed as such by EPA. If Xcel has a complaint about the release of the document in this case, that complaint should be registered with the EPA's reviewing authority, not with this Court.

him to relief." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.1986) (citations omitted). The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Thus, a well-pled complaint may proceed even if it appears "that recovery is very remote and unlikely." *Id.* at 1965 (quotation omitted).

On a Motion to Dismiss, the Court generally may not consider matters outside the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The Court may, however, consider materials that are "necessarily embraced by the pleadings," *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F.Supp. 1148, 1152 (D.Minn.1997) (Tunheim, J.), including "items appearing in the record of the case, and exhibits attached to the complaint." 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 2d* § 1357.

As noted above, a preliminary injunction is granted and thus Xcel's Motion to Dismiss should be denied as to the EPA subpoena. Yet Xcel's Motion also encompasses EPA's claim for civil penalties pursuant to 42 U.S.C. § 7413(e). Namely, Xcel points to the provision that states that "[t]he Court shall not assess penalties for noncompliance with ... actions under section 7414 ..., where the violator had sufficient cause to violate or fail or refuse to comply," 42 U.S.C. § 7413(e)(1), in order to absolve it of liability for the civil penalties.

 Determining whether to assess such a penalty is a factually intensive analysis that requires more record development. Indeed, affirmative defenses are "'generally not a basis for a motion to dismiss under 12(b)(6) but rather a matter to be pleaded as an affirmative defense.'" *Stephenson v. Deutsche Bank AG*, 282 F.Supp.2d 1032, 1065 (D.Minn.2003) (Kyle,

J.) (quoting *Stern v. Am. Bankshares Corp.*, 429 F.Supp. 818, 827 (E.D.Wis. 1977)). Such defenses may only serve as a basis for a motion to dismiss "where the complaint *clearly* shows the existence [of] a defense." *Id.* (citing Wright & Miller, *supra*) (emphasis in original).

 At the outset, the Court notes that this is a case of first impression in which well-reasoned arguments were made on both sides. That fact alone weighs heavily in Defendants' favor. Nevertheless, the CAA delineates several factors that must be analyzed before a court can determine the propriety of civil penalties in a particular case. 42 U.S.C. § 7413(e)(1). Because the record is insufficiently developed as to those specific factors, it is imperative that the parties develop the record further before the Court makes that determination.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Preliminary Injunction (Docket No. 6) is **GRANTED,** and Defendants are required to provide to EPA, within 30 days, all documents existing at the time of this Order that are related to any capital projects at the Black Dog or Sherburne County power plants and that (a) were under construction as of the date of EPA's initial Section 114 request dated July 24, 2009, through entry of this Order, or (b) are planned to begin actual construction within two years of entry of this Order.

a. For the purposes of this Order, the following definitions apply.

i. "Begin actual construction" shall have the same meaning as that term under EPA's PSD regulations, 40 C.F.R. § 52.21(b)(11).

ii. "Capital Projects" shall have the same meaning as under EPA's Section 114 Requests, specifically: a monetary expenditure on depreciable equip-

ment, including any costs to design, engineer, transport, and install said equipment.

iii. "Documents" shall have the same meaning as under EPA's Section 114 Request, specifically: any object that records, stores, or presents information, and includes writings, memoranda, records, or information of any kind, formal or informal, whether wholly or partially handwritten or typed, whether in computer format, memory, or storage device, or in hard copy, including any form or format of these. If in computer format or memory, each such document shall be provided in translation to a form useable and readable by EPA, with all necessary documentation and support. All documents in hard copy should also include attachments to or enclosures with any document.

2. Defendants' Motion to Dismiss (Docket No. 13) is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**U.S. Department of Justice**
Environment and Natural Resources Division
Environmental Enforcement Section

| | | |
|---|---|---|
| *Regular Mail: P.O. Box 7611* | *Overnight: ENRD Mail Room, Rm 2121* | *Telephone: (202) 514-2445* |
| *Ben Franklin Station* | *601 D St., NW* | *Facsimile: (202) 514-0097* |
| *Washington, D.C. 20044-7611* | *Washington D.C. 20004* | *E-mail:jim.lofton@usdoj.gov* |

*via First Class Mail, Email and Fax*

January 3, 2011

Cases Publishing Center
610 Opperman Drive
PO Box 64526
Eagan, MN 55123

> Re: September 27, 2010 Memorandum and Order, in *United States v. Xcel Energy, Inc.*, 0:10-cv-02275-PAM-JSM (D. Minn.)

Dear Sir/Madam:

I write on behalf of the United States Department of Justice regarding the opinion in the above-referenced matter that was issued on September 27, 2010 by the Honorable Judge Paul A. Magnuson of the United States District Court for the District of Minnesota. The opinion granted a preliminary injunction requested by the United States under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.* As Judge Magnuson noted, his opinion dealt with "a case of first impression" under the CAA. (Slip Op. at 21). Both the private bar and the government would benefit from the guidance that the opinion provides. As such, we respectfully request that Westlaw publish the opinion in the Federal Supplement, or in the alternative, make it available on-line to Westlaw subscribers. For your reference a copy of the opinion is enclosed. Thank you for considering our request.

Sincerely,

Jim Lofton
Counsel to the Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

Enclosure